Harry A. Worth and Helen R. Worth v. Commissioner.
Worth v. Commissioner
Docket No. 78891.
United States Tax Court
T.C. Memo 1961-39; 1961 Tax Ct. Memo LEXIS 310; 20 T.C.M. (CCH) 216; T.C.M. (RIA) 61039; February 17, 1961
*310 1. Petitioner, Harry A. Worth, a licensed real estate broker, sold 28 parcels of unimproved land in two years through a real estate company of which he was president. He also owned not less than 50 percent of its stock during the period in question. Profits on such sales accounted for a large portion of his income. An active sales program was pursued and petitioner was in practical control of sales including selling prices. Held: That except with respect to one strip, the parcels of unimproved land were held primarily for sale to customers in the ordinary course of business. 2. Interest in certain unimproved lots alleged to be the property of petitioner Helen Worth held to be the property of petitioner Harry Worth. 3. Petitioner Harry A. Worth, a corporation president, incurred expenses on behalf of the corporation for traveling and entertainment for which he expected reimbursement. The corporation did not in fact reimburse him for such expenses. Held: That said expenses are not deductible by petitioner. E. C. Pommerening, Esq., 231 W. Wisconsin Ave., Milwaukee, Wis., and Glen E. Pommerening, Esq., for the petitioners. William J. Wise, Esq., and James T. Wilkes, Esq. *311 , for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: Respondent determined deficiencies in income tax of petitioners as follows: Addition to
tax under Sec.
Year
Deficiency
6654, I.R.C. 1954
1955
$3,311.60
$29.15
1956
909.64
None
The issues involved are: (1) Whether certain parcels of unimproved real estate sold during the taxable years were then held primarily for sale to customers in the ordinary course of business, or for investment purposes. (2) Whether an interest in certain of said parcels of real estate was owned by Harry or Helen. (3) Whether petitioner may deduct unreimbursed expenses which were expended during the taxable year 1955 on behalf of his employer. The determination by respondent of deficiencies in tax included deficiencies in self-employment tax for both of the petitioners for 1955 and for Helen in 1956. The disposition of this issue will be controlled by our conclusions with respect to the issues above referred to. Findings of Fact The stipulated facts are so found and are incorporated herein by this reference. Harry A. Worth (hereinafter referred to as petitioner) *312 and his wife Helen filed timely joint Federal income tax returns for the taxable years 1955 and 1956 with the district director of internal revenue, Milwaukee, Wisconsin. Over the two-year period in question, petitioner engaged in 28 separate real estate transactions involving parcels which he wholly or partially owned. All gains on the sales of these parcels were reported as long-term or short-term capital gains of petitioner or his wife, as follows: Long-term
Short-term
1955
1956
1955
1956
Harry
$ 8,953.69
$ 2,601.93
Helen
8,539.16
4,532.22
$ 1,138.42
Total
$17,492.85
$ 7,134.15
$ 1,138.42
The Commissioner disallowed the long-term capital gain treatment on all of the sales on the ground that all of the property so sold was held primarily for sale to customers in the ordinary course of business. Petitioner was granted a real estate broker's license in 1922, which has been in force and effect since that time. In 1955 and 1956, petitioner was president of the Shorewood Realty and Finance Corporation (hereinafter referred to as the company), a Wisconsin corporation engaged in the general insurance and real estate business. During *313 the year 1955, he owned 50 per cent of the stock and the other half was owned by Edwin Kern. Kern was also active in the company's affairs. Helen has never been a licensed real estate broker or salesman and has never taken any active part in the company's business or in the sale of real estate. In 1956, Kern sold his interest and the company became wholly owned by petitioner and his family. In 1946, the company entered into a contract with the then owner (Coughlin) under which the company was to subdivide, improve, and sell a large area of land known as Fairy Chasm Estates. In February of 1954, after 65 percent of the lots were sold, Coughlin asked petitioner if it were possible to dispose of the remaining 20 parcels in one transaction. Petitioner contacted friends, the Scheubers, and his business associate, Kern, and they agreed to purchase the property jointly. Hildegard Scheuber was to take an undivided one-half interest, and Kern and petitioner were each to take a quarter interest. The Worth one-fourth interest, though nominally referred to as belonging to Helen, was actually owned and controlled by Harry. All of the property in question was taken in the name of Hildegard Scheuber. *314 The purchase price of the 20 lots was $20,000. A mortgage of $9,000 was taken back by Coughlin and $11,000 cash was paid by Hildegard upon the transfer on February 9, 1954. At that time both petitioner and Kern owned her $5,500, or $2,750 each for his quarter share. On February 15, 1954, petitioner issued a check to Hildegard in the amount of $3,700 to be applied to the balance owed by himself and Kern. After two of the lots were sold by petitioner (in 1954) and the profits distributed to Hildegard, Kern, and petitioner, in accordance with their respective interests, petitioner and Kern each gave Hildegard a check for $900, paying his balance in full. Both of the checks issued by petitioner were signed by him. Under his signature on each, the words "Trust Fund Acct" are subscribed in his handwriting. Soon afterwards, in June of 1954, nine more parcels were jointly purchased by petitioner and Hildegard in the Fairy Chasm Estates. At the time of the purchases of all 29 parcels, there was an agreement between the parties that petitioner, acting through his company, would have sole discretion as to when the parcels would be sold and at what prices. Upon the sale of each parcel, Hildegard *315 would execute a deed to the property. The company would deduct its commissions and expenses and pay the balance to the parties in interest in their respective proportions. Neither Helen nor Hildegard exercised any supervision or control over the company regarding any of the sales in question. The property was never improved by anyone after the purchase. In disposing of the property, the petitioner pursued the policy of holding the property only as long as it was necessary to make a substantial profit. Some of the parcels were disposed of almost immediately. A total of 16 sales were made in 1954, 12 in 1955, and one in 1956. (Only the 13 sales made in 1955 and 1956 are now in issue.) The length of time each parcel was held is summarized as follows: Up to 6 months
10
Up to 12 months
12
Up to 18 months
5
Up to 24 months
2
29
A home in the area which had been financed by the company was available for exhibition to prospective buyers of lots. Petitioner was stationed in the house from time to time with a plat of the area and solicited sales of lots to prospects. Signs with the company name on them were also placed on the lots in the area. In 1954, *316 after 16 of the Fairy Chasm lots were sold, petitioner filed an individual income tax return for the State of Wisconsin. In answer to the question, "Does your wife have separate income?", petitioner entered "No." All 16 of the parcels were included in the return as the property of petitioner, together with Hildegard, and in some cases, Edwin Kern. Helen is not mentioned as owning an interest in any of the parcels. Petitioners' 1954 Federal income tax return was not offered in evidence. A number of the settlement statements of the company for the years 1954 through 1956 concerning the Fairy Chasm property were introduced into evidence. All of the statements name Hildegard as the owner of the parcel sold. In some instances, the net profit is itemized with a portion designated as belonging to "Harry A. Worth," "H. A. Worth," or "Worth." In no statement is Helen mentioned as possessing any interest in the property or in the profits from the sale thereof. During the years 1955 and 1956, petitioner, in addition to the 13 lots above referred to, sold 15 more parcels of unimproved land. The transactions are summarized in our Schedule A as follows: SCHEDULE A
Period Held
Net Worth
Description
Year
Mo.
Day
Gain
Lot 3, New Butler
0
1
29
$ 274.40 a
Lot 8.9, Capital Manor
0
1
15
864.02 a
N-1/2 lot 13, Sub. 77
1
7
7
272.50 a
N-1/2 lot 15, Sub. 77
1
6
20
397.04 a
Lots 7 & 8, Glendale
1
8
21
2,736.57 a
Lot 5, Blk. 2, Glendale
3
5
12
488.00 b
Lot 4, Blk. 2, Glendale
3
10
21
358.35 b
.98 acres, Glendale
3
7
10
389.90 b
40inch Shorewood
3
10
26
4,410.35 b
15 lots, Mequon
0
10
18 c
3,388.09 b
Lot 6, New Butler
0
10
29
242.88 a
10 acres, Mequon
1
0
14
1,843.27 a
12 acres, Mequon
1
0
22
2,006.64 a
Lot 4, Blk. 1, Glendale
4
11
7
630.30 b
Lots 3 & 5, Blk. 1, Glendale
4
10
10
1,971.63 b
$20,272.94
*317 All of the 15 parcels above referred to were wholly or partially owned by petitioner and all were sold through the company. One of the parcels, a 40-foot strip of a larger improved tract, was sold by petitioner in 1955 in an unsolicited sale to a gas company for the purpose of erecting a gas station. The remainder of the tract was retained by petitioner for rental purposes. All of the parcels sold, other than the 40-foot strip above referred to, were purchased by petitioner with the purpose of reselling them whenever a profit could be made. None of the parcels were acquired for the purpose of producing rental income nor were they subdivided or improved in any way. In selling these parcels, the petitioner, acting through or for the company, pursued the same methods and policies as were used in selling the Fairy Chasm property. Signs were placed on many of the lots advertising them for sale. Petitioner testified: "Naturally, being in the real estate business, we had signs on the properties we had for sale. *318 " Advertisements in local papers showed that many of the parcels here involved were for sale. Most of the ads used the name "Worth" and included the phone numbers of the company and the Worth residence. There was an agreement between Worth and Kern that any sale made by either of them of privately owned property would be made through the company. The commissions on the transactions involved here accounted for a large portion of the total income of the company during these years. The company was not actively engaged in business other than the selling of the properties involved. During the years 1955 and 1956, petitioner received a salary from the company of $1,550 and $4,200, respectively. In 1955 he also received income from rental property of $866.78. The gains on the sale of the property in question accounted for approximately 90 percent of petitioner's income in 1955, and 60 percent of his income in 1956. Gains on the sale of unimproved property amounted to 65 percent of petitioner's 1954 income. Petitioner, in his 1955 income tax return, deducted from adjusted gross income the following items as miscellaneous expenses: Railroad, pullman, plane and bus
fare
$ 285.50
Hotels, telephone, cabs, etc.
245.39
Meals, clubs, entertainment for
clients, etc.
369.30
Auto expenses
1,674.50
Total
$2,574.69
*319 These expenses were paid by petitioner on behalf of the company in connection with contacting clients of the company and with the expectation by petitioner that he would be reimbursed therefor by the company. The company has never reimbursed him for these expenditures. Opinion Respondent determined that gains realized from the sale of certain unimproved real estate during the years 1955 and 1956 are taxable as ordinary income from the sale of property held primarily for sale to customers in the ordinary course of business. As to the parcels alleged to be owned by himself, petitioner contends that they were capital assets held primarily as investments, and that the gain on sale of property held over six months should be taxed as long-term capital gains. As to the property allegedly owned by Helen, there is only the argument that, since she was passive during the transactions herein involved, she cannot be deemed to have been engaged in a trade or business. Before we can decide the consequences of the sales involved, the true ownership of the properties must be determined. The petitioner alleges that all of the Fairy Chasm parcels and many of the others were partly owned by his *320 wife and that he never held any interest in them. Respondent contends that petitioner was the real owner of all of the properties, or in the alternative, albeit the wife did own the properties as alleged, the actions of petitioner, as her agent, would be attributable to her so as to place her in the real estate business. The Fairy Chasm lots were all deeded to Hildegard Scheuber who also executed the deeds on resales. Hildegard was reimbursed for one-fourth of the initial purchase price of the Fairy Chasm lots by checks signed by petitioner drawn on "Trust Fund Acct." which petitioner claims was a joint account of Helen and himself. The evidence discloses that Helen, as a practical matter, had nothing to do with the transaction and that Harry handled it himself. He obviously had the right to draw on the so-called Trust Fund Account, and there is no evidence that Helen ever drew on it. As far as he and Helen were concerned, Harry had and exercised full control over the one-fourth interest in question. Many of the settlement statements of the Fairy Chasm lots refer to petitioner as owning an interest in the parcel. Helen was never mentioned in any of them. The gains on the sale of *321 Fairy Chasm lots in 1954 were treated by petitioner as his own on his state income tax return and Helen was listed on the return as having no personal income for that year. There is no evidence that Helen used her own funds to purchase an interest in the property. Viewing all of the relevant circumstances in the record, we conclude as an ultimate fact that Harry, and not Helen, was the true owner of the one-fourth interest in question, and that Helen was at best a figurehead. We recognize and agree with petitioner that a husband and wife are separate taxpayers and each may own separate real estate or a separate interest therein. See , (1959), affd. (C.A. 7, 1960). However, even though the title to the property was taken in the wife's name (of which there is no evidence in the instant case) if the husband is the real party in interest, the property will be treated as his. , dismissed by stipulation of the parties (C.A. 5, Aug. 12, 1959). During the years *322 in question, petitioner's source of income other than salary was from rentals on income producing property and gains on the sale of unimproved property. Under these circumstances, it is clear that petitioner may be both a dealer and an investor in real estate, a dual role which we have previously recognized. . The law permits a taxpayer to hold a portion of his property for investment, if he so wishes, although holding a different portion of it primarily for sale to customers in the ordinary course of business. In such a situation the taxpayer's profit from the sales made primarily to customers in the ordinary course of business is ordinary income. With respect to property held by him for investment, however, capital gains treatment is allowed. The underlying principle here applicable was stated in , affd. (C.A. 6, 1960). Equally material to a proper consideration of the question is a recognition of *323 the fundamental objective of the capital gain provisions of the Code; this is to grant preferential treatment to the gains realized upon those transactions which are not normally the source of business income, thus easing the tax burden which might otherwise result upon the sale of a capital investment. Inasmuch as these provisions constitute an exception to the normal tax requirement of the Code, they are to be narrowly construed. * * * The issue which we have in the instant case has frequently arisen in one form or another. It is essentially an issue of fact, and no useful purpose would be served by discussing the various fact situations presented by the cases relied on by both parties. See The basic problem is whether or not the parcels in question were held primarily for sale to customers in the ordinary course of business. (C.A. 6, 1957), affirming a Memorandum Opinion of this Court. In the course of deciding the many cases posing the question of whether property is held for investment or for sale *324 in the ordinary course of business, the courts have applied a number of well recognized tests. The governing considerations have been the purpose or reason for the acquisition of the property, the number, frequency, and substantially of sales, and the extent to which the owner or his agent engaged in sales activities, by developing or improving the property, promoting the area and soliciting customers through signs and advertising. ; (C.A. 5, 1944), affirming a Memorandum Opinion of this Court; . A significant factor which may indicate the amount of time and energy the owner devoted to the sale of real estate in question is the percentage of his income which is derived from its sale. (C.A. 5, 1957), affirming a Memorandum Opinion of this Court. During the taxable years involved, petitioner disposed of 15 parcels of unimproved real estate as well as 13 of the Fairy Chasm lots. We turn first to a discussion of the latter. There has been no specific claim that the Fairy Chasm *325 property was purchased or treated as an investment other than the general allegation that all of the parcels in question were held as investments. Petitioner's contention is that his wife was the owner, that she was passive, and that, therefore, she could not have been engaged in a trade or business in selling the lots. Since we have determined the petitioner to be the real party in interest in all of the property involved here, this argument is of no avail. Petitioner's testimony makes it clear that these lots were to be held only until a substantial profit could be realized. It is true that the lots were not improved or subdivided by petitioner as the owner, but this had already been done by him for the previous owner. Petitioner was chiefly occupied in dealing in undeveloped lots which already had been subdivided. From the beginning, petitioner pursued an active course of conduct in selling the lots. Some were sold almost immediately. "For Sale" signs were placed on the property. Petitioner solicited sales from a model home in the area and many people were attracted by the signs. Sixteen of the lots were sold in 1954, twelve were sold in 1955, and one in 1956. Clearly petitioner *326 did not intend to hold the lots over a long-term period, and began an active selling program from the very beginning. It is our view, under the circumstances, that petitioner's interest in the Fairy Chasm properties was held by him primarily for sale to customers in the ordinary course of his real estate business. The fact that petitioner acted through or on behalf of his controlled corporation does not affect the result. , (at p. 916); , affd. (C.A. 3, 1958). During the years in question petitioner engaged in 15 other transactions involving vacant and unimproved property. As will appear from the summary of these sales in Schedule A of our findings, some of the gains were reported as Helen's, but viewing the record as a whole and in the practical perspective required by the tax laws, it appears that she was a mere figurehead or nominee and that the sales and gains must be attributed to Harry. The petitioner alleges that all of the property was purchased for investment purposes over the years and was not held for sale in the ordinary course of his business. *327 The only parcel here involved which petitioner claims had been held for rental purposes and not for resale was that from which he sold the 40-foot strip referred to in our findings, and discussed infra. All of the remaining parcels were unimproved, nonincome producing, and were purchased for resale. The significant question is, therefore, whether the unimproved parcels were held primarily for sale to customers in the ordinary course of business. The petitioner made 25 sales of unimproved property in 1954 at a profit of $8,360.88. In 1955, there were 22 parcels sold at a profit of $18,631.27, and six sales in 1956 at a profit of $7,134.15. The gains on sales of the unimproved property in issue accounted for approximately 90 percent of petitioner's income in 1955, and 60 percent in 1956. In 1954 he realized 65 percent of his income from such transactions. Petitioner contends that the sales involved were not part of his own individual real estate business but were made by or through the company. Petitioner, however, was president of the company and at all times here material owned at least 50 percent of its stock. Much of the active selling was carried on by petitioner himself. *328 For the practical purpose of determining whether the lots were held primarily for the purpose of sale to customers in the ordinary course of business, the question of whether the company or petitioner himself made the sales is not here significant. The petitioner was not passive in his sale of these parcels. "For Sale" signs were placed on many of them and advertisements were placed in a local newspaper concerning them. The same policy was used in disposing of these lots as was used in selling the Fairy Chasm lots, namely, to hold them long enough to realize a substantial profit. While the profit motive will not of itself change the holding and disposal of an investment into the carrying on of a business in the ordinary course, when we take into consideration all of the factors in the instant case, including the fact that petitioner was a licensed real estate dealer, that he was engaged in the sale of undeveloped real estate whenever a profit could be realized, that he did in fact conduct his activities in a manner readily recognizable as an ordinary course of doing business, that his gains accounted for a large percentage of his income, and that his activities in real estate sales *329 accounted for a large part of his time, we have no difficulty in reaching the conclusion that he was not an investor (with the exception of the 40-foot strip to be discussed infra), that he was a dealer in unimproved lots, and that his sales were primarily to customers in the ordinary course of business. The applicable principle is stated in , reversed on another issue, (C.A. 3, 1956): However, the essential fact seems to be that these properties were acquired for the purpose of resale whenever a satisfactory profit could be made. Petitioner may not have aggressively promoted the sale of these properties; but, nevertheless, the frequency and volume of its sales of undeveloped real estate and its substantial holdings of such properties convince us that these properties were held, not only for sale at some time in the future, but primarily for sale to its customers in the ordinary course of its business during each of the years here in issue. Petitioner was a dealer in undeveloped land, and gains derived from the sale of such property are taxable as ordinary income. In various cases involving licensed real estate *330 dealers, we have allowed capital gains treatment as to properties which are investments and not part of the dealer's normal stock in trade. See ; ; . One of the sales here in issue referred to in our findings involved a 40-foot strip of a larger improved income-producing parcel. The sale of this property was unsolicited and the surrounding circumstances, unlike those applicable to the sale of the unimproved lots sold in the ordinary course of petitioner's business by customary business methods, satisfy us that the strip in question had been held as an investment. As to this parcel, we hold that the gain on sale is entitled to capital gains treatment. Concerning one transaction, the sale of 15 lots in Mequon to a home builder (see Schedule A, supra), petitioner argues that the transaction was a bulk sale and that this fact refutes respondent's contention that the property was sold in the ordinary course of business. The evidence establishes the contrary. Petitioner always applied the standards of the real estate business to his decisions *331 and sold in such bulk and at such time as would enable him to realize a substantial profit. When questioned on cross-examination whether he ever intended to sell the Fairy Chasm properties as a single parcel, he testified: Well, that would be up to the judgment of the Shorewood Realty and Finance Corporation, after Mr. Kern left me it would be up to my judgment, if I felt that would be advantageous to sell them as a single parcel, we would do that, after all in the real estate business. There is no evidence that these lots were purchased for any reason or treated any differently than the other lots, the gains from the sale of which we have held, supra, to be taxable as ordinary income. The quantity, frequency, continuity, and substantiality of the sales - the relatively short periods which most of the lots were held prior to their sale - the applying of the methods and considerations of sale commonly used by dealers in real property - and the fact that every one of the parcels was sold at a profit - all tend to establish a common business pattern and to indicate that the dominant business purpose for which the lots were acquired and held was to produce profits through selling *332 them to customers in the ordinary course of business. As already pointed out, supra, petitioner was basically a dealer in Indeveloped real property during the years involved. The gains realized by him on the sale of such property must therefore be taxed as ordinary income. The final issue for our determination is whether petitioner may properly deduct on his personal income tax return the amount of $2,574.69, representing travel and entertainment expenses incurred by him in contacting and working with clients on behalf of the company. Petitioner expected to be reimbursed for these expenses by the company, but was not reimbursed only because the company was not in a position financially to repay him. The company remained liable to him for the amount in question in addition to other advances made by him for the company over the years. Respondent does not contest the validity of these expenses as bona fide business expenses and that point is not in issue here. Respondent contends, however, that since these expenses were those of the company rather than those of the petitioner, they are deductible as such only by the former. We must start with the proposition that a corporation and *333 its officers or stockholders are different entities. Consequently, the business of the corporation cannot be considered to be the business of its stockholders or officers. See . It is also well settled that the law does not permit the deduction by one taxpayer of the expenses of a separate and distinct taxpayer. . An employee may deduct unreimbursed traveling and entertainment expenses which were actually paid by him and which were ordinary and necessary expenses of his trade or business. ; , affd. without discussing this point, (C.A. 4, 1940). The employee, however, cannot deduct as his own expenses amounts which are not his, but which are, to the contrary, expenses of his corporate employer. ; *334 ; ; . It is not questioned in the instant case that the expenditures made by petitioner were for the company and not for himself, and that they were made with the understanding that he would be reimbursed therefor. That petitioner was not in fact reimbursed does not change expenditures made on behalf of the corporation into ordinary and necessary expenses of the petitioner. An agreement to reimburse, coupled with a failure to reimburse, may give rise to a debt due by the company to the petitioner, but there is no evidence in the instant case that any such debt was worthless in either of the years before us. There is no support in the record, therefore, for allowance of the deduction claimed. Adjustments relating to self-employment taxes will be required as a result of our conclusions on the basic issues and will be computed under Rule 50. Decision will be entered under Rule 50. Footnotes
a. Reported as capital gains of Helen. ↩
b. Reported as capital gains of Harry. ↩
c. The tract was sold to one purchaser in three installments pursuant to a prior agreement.↩